IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martinez

Civil Action No. 17-cv-0625-WJM

LAMAR ATU BLACKWELL,

     Applicant,

v.

MATTHEW HANSEN, and
THE ATTORNEY GENERAL OF THE STATE OF COLORADO,

     Respondents.

---

## ORDER ON APPLICATION FOR WRIT OF HABEAS CORPUS

---

     Applicant, Lamar Atu Blackwell, has filed *pro se* an Application for a Writ of Habeas

Corpus Pursuant to 28 U.S.C. § 2254 challenging the validity of his criminal conviction in

the District Court of Denver County, Colorado.   Respondents have filed an Answer

(Docket No. 15) and Applicant was afforded an opportunity to file a Reply.   Having

considered the same, along with the state court record, the Court will deny the

Application.

## I.  BACKGROUND

     On January 30, 2007, Applicant was convicted by a jury of first degree murder

(after deliberation) in Denver District Court Case No. 06CR2163.   (Docket No. 1 at 1; No.

10-1 at 5).   He was sentenced to life in prison without parole and a consecutive 18-year

term.   (*Id.*).   In Applicant's direct appeal proceeding, the Colorado Court of Appeals

summarized the relevant facts as follows:

1

> After a nightclub had closed, the victim argued with a female acquaintance and made gang-related statements. Defendant, a member of a rival gang, asked a fellow gang member, [Cleus Williams], if they were "going to do security" and handed him a silver .38 caliber Walther PPK semi-automatic pistol. Defendant told [Williams] that he was going to "merc" – meaning kill – the victim and put on a pair of gloves. As the victim and his friend walked toward their car, they were confronted by defendant and [Williams]. Defendant, armed with a black .40 caliber Taurus handgun, fired approximately seven shots directly at the victim. [Williams] fired four rounds, but claimed he only shot into the air. While the two fled the scene, they disposed of their weapons in a trash can and defendant discarded some of his clothing.   When they reached defendant's car, defendant drove at a high rate of speed, and a chase ensued. [Williams], the passenger, was apprehended when they crashed into a police car. Defendant ran from the car. Police pursued him, and he was arrested.

*People v. Blackwell* (*Blackwell I*), 251 P.3d 468, 471 (Colo. App. 2010).

After Applicant's convictions were affirmed on direct appeal, *see id.*, his petition for certiorari review was denied by the Colorado Supreme Court.   (Docket No. 10-8). Applicant then filed a petition for certiorari review in the United States Supreme Court, which was denied on October 3, 2011.   (Docket No. 10-9).

On August 15, 2012, Applicant filed a motion for state post-conviction relief. (Docket No. 10-1 at 10), which was denied by the district court.   The Colorado Court of Appeals affirmed in *People v. Lamar Atu Blackwell* (*Blackwell II*), No. 14CA1788 (Colo. App. July 21, 2016) (unpublished decision).   (Docket No. 10-13).   Applicant's petition for certiorari review was denied by the Colorado Supreme Court on January 17, 2017. (Docket No. 10-15).

Mr. Blackwell filed his § 2254 Application in this Court on March 9, 2017.   He asserts three claims for relief:

> (1) Applicant's constitutional rights were violated by prosecutorial interference with a defense witness's decision about whether to invoke his Fifth Amendment privilege against self-incrimination.   (Docket No. 1 at 4).

2

(2) Defendant counsel was constitutionally ineffective in failing to properly investigate and interview four potential defense witnesses.   (*Id.* at 8-9).

(3) The state court's failure to hold an evidentiary hearing on Applicant's allegations of newly discovered evidence denied him a state-created liberty interest established by Colorado's post-conviction procedures.   (*Id.* at 10-11).

Respondents filed a pre-answer response (Docket No. 10), in which they conceded that the § 2254 Application "appears to have been timely filed" under the one-year period set forth in 28 U.S.C. § 2244(d)(1).   (*Id.* at 4-6).   Respondents further conceded that Applicant exhausted state court remedies for claims one and three.   (*Id.* at 7, 9).   Respondents argued, however, that Mr. Blackwell failed to properly exhaust state remedies for his second claim because he did not seek certiorari review of the Colorado Court of Appeals' denial of the claim in the Colorado Supreme Court.   (*Id.* at 7-8).

In an April 14, 2017 Order, the Court rejected Respondents' assertion of the exhaustion defense as to claim two and concluded that the claim was properly exhausted in the state courts.   (Docket No. 14).   The Court dismissed claim three because the allegations failed to present a federal constitutional claim cognizable under 28 U.S.C. § 2254.   (*Id.*).   Respondents were directed to file an Answer to the merits of exhausted federal constitutional claims one and two.   (*Id.*).   Those claims are reviewed below under the deferential AEDPA standard of review.

## II.  LEGAL STANDARDS

### A. 28 U.S.C. § 2254

Title 28 U.S.C. § 2254(d) provides that a writ of habeas corpus may not be issued

with respect to any claim that was adjudicated on the merits in state court unless the state

court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). The applicant bears the burden of proof under § 2254(d). *See*

*Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam).

The Court reviews claims of legal error and mixed questions of law and fact

pursuant to 28 U.S.C. § 2254(d)(1). *See Cook v. McKune*, 323 F.3d 825, 830 (10th Cir.

2003). The threshold question the Court must answer under § 2254(d)(1) is whether the

applicant seeks to apply a rule of law that was clearly established by the Supreme Court

at the time his conviction became final. *See Williams v. Taylor*, 529 U.S. 362, 390

(2000). Clearly established federal law "refers to the holdings, as opposed to the dicta,

of [the Supreme] Court's decisions as of the time of the relevant state-court decision."

*Id.* at 412. Furthermore,

> clearly established law consists of Supreme Court holdings in cases where the facts are at least closely-related or similar to the case *sub judice*. Although the legal rule at issue need not have had its genesis in the closely-related or similar factual context, the Supreme Court must have expressly extended the legal rule to that context.

*House v. Hatch*, 527 F.3d 1010, 1016 (10th Cir. 2008). If there is no clearly established

federal law, that is the end of the court's inquiry pursuant to § 2254(d)(1). *See id.* at

1018.

If a clearly established rule of federal law is implicated, the Court must determine

whether the state court's decision was contrary to or an unreasonable application of that

clearly established rule of federal law.  *See Williams*, 529 U.S. at 404-05.

> A state-court decision is contrary to clearly established federal law if:
> (a) "the state court applies a rule that contradicts the governing law set forth
> in Supreme Court cases"; or (b) "the state court confronts a set of facts that
> are materially indistinguishable from a decision of the Supreme Court and
> nevertheless arrives at a result different from [that] precedent."  *Maynard*
> [*v. Boone*], 468 F.3d [665,] 669 [(10th Cir. 2006)] (internal quotation marks
> and brackets omitted) (quoting *Williams*, 529 U.S. at 405).  "The word
> 'contrary' is commonly understood to mean 'diametrically different,'
> 'opposite in character or nature,' or 'mutually opposed.'"  *Williams*, 529
> U.S. at 405 (citation omitted).
>
> A state court decision involves an unreasonable application of
> clearly established federal law when it identifies the correct governing legal
> rule from Supreme Court cases, but unreasonably applies it to the facts.
> *Id.* at 407-08.  Additionally, we have recognized that an unreasonable
> application may occur if the state court either unreasonably extends, or
> unreasonably refuses to extend, a legal principle from Supreme Court
> precedent to a new context where it should apply.

*House*, 527 F.3d at 1018.

The federal court's inquiry pursuant to the "unreasonable application" clause is an

objective inquiry.  *See Williams*, 529 U.S. at 409-10.  "[A] federal habeas court may not

issue the writ simply because that court concludes in its independent judgment that the

relevant state-court decision applied clearly established federal law erroneously or

incorrectly. Rather that application must also be unreasonable."  *Id.* at 411. "[A] decision

is 'objectively unreasonable' when most reasonable jurists exercising their independent

judgment would conclude the state court misapplied Supreme Court law."  *Maynard*, 468

F.3d at 671.  In addition,

> evaluating whether a rule application was unreasonable requires
> considering the rule's specificity. The more general the rule, the more
> leeway courts have in reaching outcomes in case-by-case determinations.
> [I]t is not an unreasonable application of clearly established Federal law for
> a state court to decline to apply a specific legal rule that has not been

squarely established by [the Supreme] Court.

*Harrington v. Richter*, 562 U.S. 86, 101 (2011) (internal quotation marks and citation omitted). In conducting this analysis, the Court "must determine what arguments or theories supported or . . . could have supported[ ] the state court's decision" and then "ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id.*

Under this standard, "only the most serious misapplications of Supreme Court precedent will be a basis for relief under § 2254." *Maynard*, 468 F.3d at 671; *see also Richter*, 562 U.S. at 88 (stating that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable").

> As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Richter*, 562 U.S. at 102.

"[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 131 S.Ct. 1388, 1398 (2011).

The court reviews claims asserting factual errors pursuant to 28 U.S.C. § 2254(d)(2). *See Romano v. Gibson*, 278 F.3d 1145, 1154 n. 4 (10th Cir. 2002). Section 2254(d)(2) allows the federal court to grant a writ of habeas corpus only if the relevant state court decision was based on an unreasonable determination of the facts in light of the evidence presented to the state court. Pursuant to § 2254(e)(1), the court

must presume that the state court's factual determinations are correct and the petitioner bears the burden of rebutting the presumption by clear and convincing evidence. "The standard is demanding but not insatiable . . . [because] '[d]eference does not by definition preclude relief.'" *Miller–El v. Dretke*, 545 U.S. 231, 240 (2005) (quoting *Miller–El v. Cockrell*, 537 U.S. 322, 340 (2003)).

## B. *Pro Se* Litigant

Applicant is proceeding *pro se*. The Court, therefore, "review[s] his pleadings and other papers liberally and hold[s] them to a less stringent standard than those drafted by attorneys." *Trackwell v. United States*, 472 F.3d 1242, 1243 (10th Cir. 2007) (citations omitted); *see also Haines v. Kerner*, 404 U.S. 519, 520–21 (1972). However, a *pro se* litigant's "conclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). A court may not assume that an applicant can prove facts that have not been alleged, or that a respondent has violated laws in ways that an applicant has not alleged. *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983). *Pro se* status does not entitle Applicant to an application of different rules. *See Montoya v. Chao*, 296 F.3d 952, 957 (10th Cir. 2002).

## III. ANALYSIS

## A. Claim One

In his first claim, Applicant contends that his constitutional rights were violated by the prosecutor's interference with a defense witness's decision about whether to invoke his Fifth Amendment privilege against self-incrimination.

(Docket No. 1 at 4).

## 1. State Court Proceedings

In *Blackwell I*, the Colorado Court of Appeals summarized the proceedings in the

trial court as follows:

>    Defendant subpoenaed J.N., C.W.'s [Cleus Williams'] former cellmate, to testify concerning statements C.W. had allegedly related to him. J.N. had asked to speak with police detectives. At the meeting's outset, he inquired, "What's in it for me?" During an audio-recorded conversation, he claimed that C.W. said, "I'll kill you, I did it once, I'll do it again," while talking in his sleep. When J.N. confronted him the following morning, C.W. allegedly confessed to killing the victim and said he continued to see the victim's mother's eyes. According to J.N., C.W. revealed that he was blaming a codefendant for the murder in exchange for a plea bargain. J.N.'s account contained numerous inaccuracies, including:

> • C.W. had been in jail for murder, although he had not been charged with murder at that time;

> • C.W. had three codefendants; however, the investigation revealed only two suspects;

> • Defendant was being held in Adams County, but he was actually in Denver County Jail;

> • The victim was shot four times, but there was evidence that he had been shot five times, and that seven shots from the murder weapon had been fired; and

> • C.W. had turned in the murder weapon, when the police found the weapons in a trash can.

> Although defendant attempted to call J.N. as a witness, he was uncooperative. During an interview, J.N. told defense counsel that he was refusing to testify. When he initially met with the prosecutor, J.N. adamantly repeated that he would not testify at trial and stated that he planned to invoke his Fifth Amendment right to remain silent. He further claimed that he could not remember what he may have told detectives. The prosecutor did not threaten criminal liability at any time during this initial meeting.

> At the prosecutor's urging, the court appointed independent counsel to represent J.N. The prosecutor informed J.N.'s counsel that, in his opinion, J.N. had a legitimate Fifth Amendment privilege because he had lied to

detectives and could be charged with perjury or false reporting if he testified. Following a meeting with his client, J.N.'s counsel told the court that he believed J.N. had a valid Fifth Amendment privilege and had advised his client not to testify. The defense called J.N. as a witness, but he invoked the Fifth Amendment and refused to testify.

*Blackwell I*, 251 P.3d at 471-72.

The state appellate court applied the following legal principles to Applicant's claim

that he was denied a fair trial because the prosecution interfered improperly with J.N.'s

decision to testify:

The People's intentional, concerted effort to deprive a defendant of exculpatory testimony through witness intimidation may deprive the defendant of a fair trial. *People v. Weddle*, 652 P.2d 1111, 1112 (Colo.App.1982). To prevail on such a claim, the defendant must show governmental interference with a defense witness's choice to testify by preponderant evidence. *United States v. Vavages*, 151 F.3d 1185, 1188 (9th Cir.1998). Unnecessarily strong admonitions against perjury aimed at discouraging defense witnesses from testifying may deprive a criminal defendant of his or her Sixth Amendment right to obtain witnesses. *Id.* at 1189. Comments amounting to a threat beyond what the record indicates is necessary and appropriate suggest the prosecutor sought to coerce a witness into silence. *Id.* at 1190.

We examine the totality of the circumstances to determine whether substantial governmental interference occurred. *Id.* Among the factors we consider in determining the warnings' coercive impact are (1) the manner in which the prosecutor raises the issue, including the warnings' extent and timing, the language employed, and whether the prosecutor communicated directly with the witness or through an attorney; (2) the prosecutor's basis in the record for believing the witness might lie; (3) the warnings' effect on the witness's willingness to testify; (4) whether the court attempted to remedy any misconduct; and (5) whether the prosecutor capitalized on the witness's absence by directing the jury's attention to it during closing arguments. [Case law citations omitted].

Id. at 472-73.

The Colorado Court of Appeals concluded that J.N. was not coerced into refusing

to testify, and, therefore, that Applicant was not denied his constitutional right to present a

defense, based on the following circumstances:

- The prosecutor's warning to J.N.'s counsel that he could be prosecuted for perjury was not per se improper;

- There was "no indication" from the record "that the prosecutor raised the issue at an inappropriate time, used inappropriate language, or attempted to badger J.N. in refusing to testify";

- The prosecutor "acted properly by requesting that the court appoint independent counsel to advise J.N." and "J.N.'s attorney believed J.N. had a legitimate basis for invoking his Fifth Amendment privilege and advised his client not to testify";

- The prosecutor "did not warn J.N. about criminal charges before he had counsel and then only warned counsel outside of J.N.'s presence";

- "J.N. had indicated repeatedly that he would invoke his Fifth Amendment privilege before the prosecutor warned him about potential criminal liability"; and,

- The "inaccuracies in J.N.'s statement and his attempt to procure leniency in his pending felony cases furnished the prosecutor with a legitimate basis for believing that he had fabricated the alleged confession."

*Id.* at 473-74.

### 2. Application of AEDPA Standard of Review

Respondents argue that Applicant cannot establish that the state appellate court's decision was contrary to, or an unreasonable application of, federal law, because there is no clearly established Supreme Court decision that addresses the issue raised in claim one.   (Docket No. 15 at 12).

A "determination that there is no clearly established federal law is analytically dispositive in the § 2254(d)(1) analysis," because "without clearly established federal law, a federal habeas court need not assess whether a state court's decision was 'contrary to'

or involved an 'unreasonable application' of such law." *House*, 527 F.3d at 1017.

The Colorado Court of Appeals cited *Webb v. Texas*, 409 U.S. 95 (1972) (per curiam) in addressing Applicant's claim on direct appeal. *See Blackwell I*, 251 P.3d at 472. In *Webb*, the trial judge admonished a defense witness:

> If you take the witness stand and lie under oath, the Court will personally see that your case goes to the grand jury and you will be indicted for perjury and the liklihood (sic) is that you would get convicted of perjury and that it would be stacked onto what you have already got, so that is the matter you have got to make up your mind on. If you get on the witness stand and lie, it is probably going to mean several years and at least more time that you are going to have to serve.

*Id.* at 96. The Supreme Court held: "In the circumstances of this case, we conclude that the judge's threatening remarks, directed only at the single witness for the defense, effectively drove that witness off the stand, and thus deprived the petitioner of due process of law under the Fourteenth Amendment." *Id.* at 98.

*Webb* involved threats by a judge, not the prosecutor. *Id.* at 96. *Webb* does not constitute clearly established law in relation to Applicant's first claim because application of *Webb* would require the Court to "expressly extend" *Webb's* reasoning to a different "factual context." *See House*, 527 F.3d at 1016-17 (stating that clearly established law consists of Supreme Court holdings in cases where the facts are at least closely-related or similar to the case sub judice."). *See also Carey v. Musladin*, 549 U.S. 70, 76-77 (2006) (rejecting, under § 2254(d)(1), claim alleging the deprivation of a fair trial due as a result of the courtroom conduct of the murder victim's family members who wore buttons with a photograph of the victim, on the ground that the Court's previous decisions had only addressed improper courtroom conduct by the government). No other Supreme Court case has applied the holding in *Webb* to circumstances involving alleged threats by

a prosecutor. The lack of any clearly established federal law terminates the Court's inquiry under § 22554(d)(1). *See House*, 527 F.3d at 1017 (citing *Carey*).

However, even if *Webb's* reasoning applies to witness intimidation by the prosecutor, the Colorado Court of Appeals' decision was not an unreasonable application of *Webb*. In *Webb*, the Supreme Court found that "the unnecessarily strong terms used by the judge could well have exerted such duress on the witness' mind as to preclude him from making a free and voluntary choice whether or not to testify." 409 U.S. at 98. A judge's threat to "personally" ensure an actual prosecution, as the judge did in *Webb*, *see* 409 U.S. at 96, is markedly different from the prosecutor's conduct in this case—*i.e.*, opining to the court and to J.N.'s court-appointed attorney that J.N. likely had a valid Fifth Amendment privilege against testifying because he could be charged with perjury or false reporting. And, most importantly, J.N. had already told both the prosecution and defense counsel that he intended to invoke his Fifth Amendment right *before* the prosecutor brought the issue to the trial court's attention. As such, "[t]his was not an instance where the prosecutor issued a plain threat "calculated to transform [an individual] from a willing witness to one who would refuse to testify." *Blackwell I*, 251 P.3d at 473 (citing *United States v. Smith*, 478 F.2d 976, 979 (D.C.Cir.1973)).

Finally, Applicant's reliance on the Ninth Circuit's decision in *Vavages* is misplaced. The federal habeas court's inquiry under the deferential AEDPA standard of review is whether the state court's decision was contrary to, or an unreasonable application of federal law, "as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). In any event, *Vavages* is factually distinguishable from the instant action. The defense witness in *Vavages* invoked her Fifth Amendment right

12

against self-incrimination *after* the prosecutor spoke to her attorney and warned the attorney that if the witness testified falsely, the government could bring perjury charges against her and withdraw from the plea agreement in the witness's own criminal case. 151 F.3d at 1188.   Here, J.N. informed both the prosecutor and defense counsel that he intended to invoke his Fifth Amendment right before the prosecutor spoke to J.N.'s counsel and warned him about the possibility of perjury charges.   Moreover, in *Vavages*, the Ninth Circuit was especially concerned about the prosecutor's threat to withdraw the witness's plea agreement in her own unrelated criminal case if she testified in support of Vavages' alibi.   *Id.* at 1191.   No similar threat was made to J.N. if he testified in support of Applicant's defense.

The Court concludes that, to the extent *Webb* provides controlling federal law for Applicant's first claim for relief, the Colorado Court of Appeals' determination was not an unreasonable application of the Supreme Court decision.   Further, the Court has carefully reviewed the state court record and finds that the state appellate court's determination of the facts was reasonable in light of the evidence presented to the state courts.[1]

Applicant is not entitled to federal habeas relief on claim one.

## B.   Claim Two

In claim two, Applicant contends that defense counsel was constitutionally ineffective in failing to properly investigate and interview four potential defense witnesses: Todd Allum (a police officer working off-duty at the night club), Henry Penado (a nightclub security guard), Kevin Henderson (a night club promoter), and

---

1  *See* State Court R. ("R."), 1/29/07 Trial Tr. at 3-13, 117-18, 143-47, 154-57.

Alexandria Molina (a club patron).   (Docket No. 1 at 8-9).

## 1.  State Court Proceeding

In *Blackwell II*, the Colorado Court of Appeals applied the standard of review set

forth in *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), *see* Docket No. 10-13 at

4-5, and rejected the ineffective assistance allegations on the following grounds:

> In this case, defendant contends that defense counsel failed to
> provide effective assistance of counsel by failing to adequately
> investigate and interview four relevant witnesses who could have
> helped the defense. We disagree.
>
> The four witnesses defendant claims were not investigated or
> interviewed effectively by defense counsel could have provided only
> tangential testimony, and it was well within counsel's range of
> reasonable professional judgment not to investigate them further.
> First, none of these four witnesses were present at or saw the shooting.
> Second, defense counsel obtained through discovery written statements
> provided to the police by two of the four witnesses and a video-recorded
> interview[2] of a third describing what each had seen and heard. Based on
> his review of these materials, counsel was able to reasonably assess the
> value of the three witnesses' potential testimony.
>
> The fourth witness defendant claims should have been interviewed
> was a police officer called by the prosecution at trial. The officer testified
> that he worked off-duty at the nightclub on the night of the shooting. While
> he was dispersing the exiting crowd outside the nightclub after it closed, he
> heard shots nearby, ran to the scene of the shooting, saw two
> African-American males running away, chased them on foot for several
> blocks, and had a good opportunity to look at the two men. The men
> escaped the officer by driving away in a car, but were subsequently
> apprehended. The officer testified that he positively identified the two men
> after their arrest as the two men he had chased, and he identified one of
> them as defendant. The other man was Cleus Williams. Thus, rather than
> being able to provide exculpatory evidence, the officer's testimony was

---

2  The state appellate court noted that although the video-recording did not appear in the record on appeal,
the court assumed that it would support the district court's ruling that defense counsel had access to the
witnesses' statements and expected testimony. (Docket No. 10-13 at 6-7 n.1, citing *People v. Montgomery*,
2014 COA 166, ¶ 22 ("If an appellant does not designate as part of the record material portions of the
proceedings, a reviewing court must assume that the omitted portions would support the judgment.")).

highly incriminating.[3]

> We therefore conclude that defense counsel's decision not to interview these witnesses was well within his discretion and did not fall outside the objective standard of reasonableness established in *Strickland* . . . .

(Docket No. 10-13 at 6-8).

The state appellate court further determined that even if defense counsel's performance was deficient, Applicant failed to show that he was prejudiced as a result because of the "overwhelming evidence" of his guilt. (*Id.* at 8-9). The Colorado Court of Appeals concluded that Applicant had not established "a reasonable probability that, but for any professional errors by his counsel, the result of his trial would have been different." (*Id.* at 9).

### 2. Application of AEDPA Standard of Review

The Sixth Amendment generally requires that defense counsel's assistance to the criminal defendant be effective. *See Strickland*, 466 U.S. at 685-86. To prevail on a claim of ineffective assistance of counsel, a habeas petitioner must show both that (1) his counsel's performance was deficient (*i.e.*, that identified acts and omissions were outside the wide range of professionally competent assistance), and (2) he was prejudiced by the deficient performance (*i.e.*, that there is a reasonable probability that but for counsel's unprofessional errors the result would have been different). *Id.*

"A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable

---

3  The Colorado Court of Appeals noted that: "To the extent counsel was not aware of these facts when he elected not to interview the officer, their existence nonetheless supports our conclusion on the prejudice prong of the *Strickland* test, as discussed below." (Docket No. 10-13 at 8, n.2).

professional assistance." *Harrington*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 689). "With respect to prejudice, . . . '[a] reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting *Strickland*, 466 U.S. at 694). "The likelihood of a different result must be substantial, not just conceivable." *Strickland*, 466 U.S. at 693.

"Surmounting *Strickland*'s high bar is never an easy task." *Richter*, 562 U.S. at 105 (internal quotation omitted). "Establishing that a state court's application of *Strickland* was unreasonable under §2254(d) is all the more difficult." *Id.* "When §2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

When both Strickland prongs have been adjudicated on the merits by a state court, AEDPA bars relief unless an exception to § 2254(d) is met with respect to both prongs. *See Hancock v. Trammell*, 798 F.3d 1002, 1023 (10th Cir. 2015) (petitioner "had to show that all fair-minded jurists would agree that (1) trial counsel's performance was objectively deficient, and (2) there was a 'reasonable likelihood' that the jury would have" acquitted).

Initially, the Court finds that the state court record supports the Colorado Court of Appeals' determination that defense counsel had the opportunity to review statements made to the police by Henry Penada, Kevin Henderson and Alexandria Molina and that counsel's decision not to investigate further, or to call these individuals as witnesses, was strategic.[4]

---

4 R., Court File at 405-408 (police reports of statements made by Penada, Molina and Henderson); *Id.* at 462-465 (written statements by Penada and Molina); *see also* 1/29/07 Trial Tr. at 165 (bench conference

Henry Penada, a security officer at the night club, told the police that he saw Applicant mingling with others as he exited the club, but did not see Applicant involved in an altercation with anyone that evening.[5] Applicant contends that Mr. Penada could have corroborated the testimony of defense witness April Thompson, Applicant's cousin, that Applicant and Cleus Williams were separated as they left the club. (Docket No. 1 at 9).[6] However, Mr. Penada's testimony would have been merely cumulative to the testimony of Thompson.

Kevin Henderson, a nightclub promoter, told the police that he did not witness the shooting, but saw the individuals involved flee the scene immediately thereafter, and that a person matching Cleus Williams' description was carrying a black gun.[7] The trial court reviewed Mr. Henderson's videotaped statement and concluded that Henderson's statements about who fired the murder weapon were ambiguous and did not constitute evidence that Williams was the murderer.[8] Thus, it was reasonable for defense counsel to conclude that Henderson's purported testimony would not necessarily have aided the defense.

Alexandria Molina, a nightclub patron, reported to the police that she fell to the ground when she heard gunshots and saw some men run past her immediately after the shooting, but she did not identify either Applicant or Williams in the photo arrays shown to

concerning Henderson's videotaped statement to the police).
5 R., Court File at 405, 462-63.
6 See also R., 1/29/07 Trial Tr., (Thompson testimony) at 170-74.
7 R., Court File at 408.
8 R., 1/29/07 Trial Tr. at 165; 1/30/07 Trial Tr. at 32. The trial court's ruling was made in conjunction with the court's previous ruling that there was no evidentiary basis to admit J.N.'s audiotaped interview with the police into evidence after J.N. took the Fifth Amendment and refused to testify. See 1/29/07 Trial Tr. at 154-57.

her by the police.[9] Because Ms. Molina did not witness the shooting and did not know for certain that the shooter was one of the men who ran by her after the shooting, it was reasonable for defense counsel to conclude that her purported testimony would not necessarily have aided the defense.

Applicant also contends that defense counsel should have further investigated Denver police officer Todd Allum, who issued citations to two of the three individuals who had been ejected from the night club by key prosecution witness Jason Francis, a private security officer at the club, approximately one hour before the shooting for an unrelated disturbance. (Docket No. 1 at 8).[10] Mr. Francis testified that he was outside after the nightclub closed and witnessed one of the same individuals whom he had ejected from the club earlier running down the street and fire five or six shots at the victim at point-blank range.[11] Officer Allum also testified at trial, but defense counsel did not question him about the citations he had issued the night of the murder.[12] Applicant asserts that counsel should have investigated the persons cited by Officer Allum because those individuals could have testified that they did not know Applicant and that he was not one of the persons ejected from the club by Mr. Francis. (Docket No. 1 at 7). However, defense counsel did cross-examine Mr. Francis about the two persons to whom Officer Allum had issued citations and Francis stated that the shooter had not been issued a citation, but the shooter's associates may have been cited.[13] Further, although defense counsel contacted Officer Allum before trial and placed him under subpoena, it was not

_____

9 R., Court File at 406-07, 464-65.
10 *See also* R., 1/25/07 Trial Tr. at 54-66, 78.
11 *Id.*
12 R., 1/25/07 Trial Tr. at 98-121.
13 *Id.* at 77-78.

unreasonable for the defense to decide to minimize Allum's testimony, given that Allum was an important prosecution witness.[14]

The Court finds that the Colorado Court of Appeals determined, consistent with *Strickland*, that defense counsel's decision not to call Penada, Molina and Henderson as witnesses, or to further investigate the citations issued by Officer Allum before the shooting, was sound trial strategy. Applicant has not pointed to anything in the state court record to rebut the presumption that counsel's professional assistance with regard to the investigation of these witnesses was objectively reasonable.

Further, the state appellate court's conclusion that Applicant was not prejudiced by counsel's failure to investigate the witnesses is supported by the evidence presented in the state court proceeding. None of the four witnesses identified by Applicant witnessed the shooting and there was substantial evidence that Applicant, rather than an alternative suspect, committed the murder. Specifically:

- Jason Francis saw that Applicant "had the gun on the victim" and saw him "pulling the trigger" at "point-blank range."[15]

- Jerome Deal, the victim's friend, identified Applicant as the shooter and testified that he saw Applicant "cock[ ] the gun" and "point[ ] it right at [the victim] and start[ ] shooting at him."[16]

- Applicant told Cleus Williams that he was going to "merc" (kill) the victim, and then Williams watched Applicant put on a pair of gloves, pull out his gun, and shoot the victim.[17]

- Todd Allum, the police officer who was in hot pursuit of Applicant after the shooting, saw Applicant run by the trash can where two guns, one of which was the murder weapon, were found. Officer Allum positively identified Applicant

14 *Id.* at 121; 1/30/07 Trial Tr. at 69-70.
15 R., 1/25/07 Trial Tr. (Francis Testimony) at 63.
16 R., 1/26/17 Trial Tr. (Deal Testimony) at 25-26, 39, 59).
17 R., 1/29/07 Trial Tr. (Williams Testimony) at 32, 35-36.

as one of the two men he chased when they ran away from the scene of the shooting[18]

- Applicant went to extreme efforts to elude the police, running away on foot and then driving away at high speeds through crowded downtown Denver streets.[19]

- Applicant's glove, which was found in the car he drove while eluding police immediately after the shooting, had gunshot residue.[20]

The Colorado Court of Appeals' determination that it was not reasonably probable, in light of the overwhelming evidence of the Applicant's guilt, that counsel's additional investigation of, or procurement of certain testimony from, the four witnesses, would have resulted in an acquittal did not run afoul of *Strickland*. Stated otherwise, the state appellate court's decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 102. *See also Martinez v. Tafoya,* No. 00-2445, 13 F. App'x 873, 877-78 (10th Cir. 2001) (denying habeas relief on ineffective assistance claim because nature of witnesses' potential testimony was peripheral, and defense counsel's investigation of such testimony would not have "altered counsel's performance or the result of the trial," particularly given that several eyewitnesses to the crime positively identified petitioner as the assailant).

Applicant is not entitled to federal habeas relief for his second claim.

## IV. ORDERS

For the reasons discussed above, it is

ORDERED that the Application for a Writ of Habeas Corpus Pursuant to 28 U.S.C.

---

18  R., 1/25/07 Trial Tr. (Allum Testimony) at 101-118; *id.* (Staab, Frushour and Murr Testimony) at 168-72; 195-198, 224-26.
19  R., 1/26/07 Trial Tr. (Mattos and Morgan Testimony) at 95-104;146-158.
20  *Id.* (Mattos and Smith Testimony) at 115, 187-88, 193-195.

§ 2254 (Docket No. 1), filed by Applicant, Lamar Atu Blackwell, on March 9, 2017, is
DENIED.   The Application is DISMISSED WITH PREJUDICE.   It is

FURTHER ORDERED that no certificate of appealability shall issue because
Applicant has not made a substantial showing of the denial of a constitutional right. 28
U.S.C. § 2253(c)(2); Fed. R. Governing Section 2254 Cases 11(a); *Slack v. McDaniel*,
529 U.S. 473, 483-85 (2000).   It is

FURTHER ORDERED that leave to proceed *in forma pauperis* on appeal is
denied.   The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this
order would not be taken in good faith   *See Coppedge v. United States*, 369 U.S. 438
(1962).   If Applicant files a notice of appeal he must also pay the full $505 appellate filing
fee or file a motion to proceed *in forma pauperis* in the United States Court of Appeals for
the Tenth Circuit within thirty days in accordance with Fed. R. App. P. 24.

Dated this 26th day of June, 2017.

BY THE COURT:

William J. Martinez
United States District Judge